Jeremy Delicino, USB # 9959
9 Exchange Place #600
Salt Lake City, UT 84111
Telephone: (801) 364-6474

Jon D. Williams, USB # 8318
9 Exchange Place #600
Salt Lake City, UT 84111
Telephone: (801) 746-1460

Attorneys for Plaintiff Charlene Hack

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**CENTRAL DIVISION**

| | |
|---|---|
| CHARLENE HACK,<br><br>Plaintiff,<br><br>v.<br><br>DANIEL M. PRESTON a/k/a DANIEL PRESTON MARTIN, JEFFREY PAUL HACK, JAYNE D. HACK, and DOES 1-10, inclusive,<br><br>Defendants. | **Civil Action: 2:25-cv-634**<br><br>**COMPLAINT FOR:**<br>**1. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**<br>**2. TRESPASS;**<br>**3. ASSAULT;**<br>**4. CIVIL CONSPIRACY;**<br>**5. INTENTIONAL INTERFERENCE WITH CONTRACT**<br><br>**DEMAND FOR TRIAL BY JURY** |

Plaintiff Charlene Hack alleges as follows:

## THE PARTIES

1. Plaintiff Charlene Hack is a resident of Mississippi.

2. Defendant Daniel M. Preston a/k/a Daniel Preston Martin is a resident of Colorado. Daniel is the ex-husband of Charlene's sister Cheryl Preston.

3. Defendant Jeffrey Paul Hack is a resident of Arizona. Jeffrey is Charlene's estranged brother.

4. Defendant Jayne D. Hack is a resident of Florida. Jayne is Charlene's estranged mother.

5. Does 1-10, inclusive, are persons presently unknown to Charlene who, upon information and belief, aided and abetted the tortious conduct described below. Charlene will seek leave to amend this complaint and add additional party defendants to this action as the same become known to Charlene through discovery in this litigation.

## JURISDICTION AND VENUE

6. This Court has diversity subject matter jurisdiction over this matter under 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000 and is between citizens of different states.

7. Additionally, this Court has subject matter jurisdiction over this matter under Utah's Long Arm Statute, Utah Code. Ann. § 78B-3-205, because Defendants' tortious conduct described below occurred in Grand County, Utah.

8. This Court is the appropriate venue for this action.

## BACKGROUND FACTS

### A. Charlene's vision of a magical and memorable wedding

9. Charlene intended to marry the love of her life, Sam Cannon, at the Whispering Oaks Ranch in Moab, Utah on August 5, 2023. Sam and Charlene exchanged their first "I love you" in Moab. They planned their wedding ceremony in Moab because they wanted to share the city's beauty and its sense of adventure and community with their loved ones. They wanted to celebrate the start of their married life together in a city they truly loved.

10. Charlene entered into various contracts with vendors, planners, and other consultants, including the Whispering Oaks Ranch. The purpose of these contracts, of course, was to ensure that Charlene's wedding day was as magical and memorable as she always hoped it would be.

### B. Charlene's estrangement from her brother, her family issues, and her decision to disinvite her mother from her wedding

11. Charlene's relationship with several of her family members was strained as her wedding day approached. Charlene has been estranged from her brother, defendant Jeffrey Paul Hack, since 2010. Over the years, Jeffrey has constantly harassed Charlene through vile phone calls, messages, and prank e-mails. Needless to say, Charlene didn't invite Jeffrey to the wedding.

12. Charlene also had a strained relationship with her mother, defendant Jayne D. Hack, for years. Despite this strained relationship, Charlene initially invited her mother to her wedding.

13. In the months before the wedding, Charlene's sister, Cheryl Preston, was engaged in a serious of tumultuous battles with her ex-husband, defendant Daniel M. Preston, over child custody and other post-divorce issues. Daniel routinely threatened Cheryl with violence and both Cheryl and Charlene were afraid of him. To make matters worse, Daniel began living with Jayne during this time and, upon information and belief, they began a romantic and/or sexual relationship.

14. Jayne began pestering Charlene to invite Daniel to the wedding. Charlene refused, stating she was afraid that Daniel would disrupt the ceremony, start a fight with Jeff Hack, or worse. Nevertheless, Jayne's pleas on Daniel's behalf became more frequent, more insistent, and more aggressive as the wedding day approached.

15. On July 2, 2023, Jayne called Charlene and once again aggressively demanded that Daniel be invited to the wedding ceremony. Tired of her mother's behavior, Charlene told Jayne she was no longer welcome at the wedding.

16. Later that day, Jayne called Charlene and threatened "if you uninvite me you'll be sorry."

17. Charlene was unnerved by her mother's comment and the prospect of Jayne, Daniel, and/or Jeffrey crashing her wedding. She confided these fears to Ciera, her wedding planner. Ciera asked Charlene for pictures of Jayne and Daniel and instructed her staff to keep their eyes open for these individuals. Ciera Binks also e-mailed Jayne and told her, in no uncertain terms, that she was not welcome at the wedding. Jayne responded with threats.

**C. Jayne, Jeffrey, and Daniel conspire to ruin Charlene's wedding**

18. Charlene's fears weren't unfounded. In the days following the July 2nd telephone calls between Charlene and Jayne, Jayne, Jeffrey, and Daniel planned a scheme to ruin Charlene's wedding.

19. Jayne, Jeffrey, and Daniel ultimately agreed to use a third party to crash the wedding ceremony and make a bomb threat.

20. Jeffrey and Daniel recruited Connor Freeman Sprague to travel to Moab, appear at the wedding, and make a bomb threat. Sprague served in the United States Marines with Jeffrey but was dishonorably discharged. Sprague lived at Jeffrey's home from time to time over the last few years and owed Jeffrey money—a possible motivation for his agreement to perform this grim task for Jayne, Jeffrey, and Daniel.

21. Sprague was ultimately found guilty of several criminal charges arising from his wrongful conduct described below. During his criminal trial, Sprague

testified that he communicated with Jeffrey and Daniel about the plan to ruin Charlene's wedding. During those communications, Jeffrey and Daniel admitted that they, along with Jayne, wanted to ruin Charlene's wedding because of her refusal to invite them to the wedding.

22. Because Jayne was originally invited to the wedding, she possessed a copy of the wedding invitation. The invitation noted the wedding ceremony would begin at 5:00 p.m. on August 5th. Upon information and belief, Jayne, Jeffrey, and Daniel conspired to have Sprague make his bomb threat slightly after 5:00 p.m. because that would ensure the ceremony was disrupted right around the time Charlene and Sam would be walking down the aisle.

**D. The Day of the Wedding**

23. Sprague traveled to and arrived at the Whispering Oaks Ranch on August 4, 2025—the day before the wedding. Since this was a destination wedding, many of Charlene's invited family and friends enjoyed the Whispering Oaks Ranch property and stayed at its cabins in the days before the ceremony. Several wedding guests saw Sprague at the property on August 4th. Indeed, Sprague introduced himself to Sam's parents as a videographer hired to film the ceremony. One guest later saw Sprague inside a cabin—a place he definitely shouldn't have been—later that night.

24. As indicated in the invitation, the wedding ceremony began at 5:00 p.m. the next day.

25. As Sam walked down the aisle, and as Charlene was preparing to walk down the aisle—possibly the single most important and memorable part of the entire ceremony, and the moment Charlene had long waited for—Sprague approached Ciera Binks, the wedding planner, who was waiting in the wings and observing the ceremony.

26. Sprague was wearing what appeared to be a vest containing sticks of dynamite, a makeshift timer, and various exposed wires. It was fashioned to look like a bomb vest used by terrorists.

27. Sprague told Ms. Binks that he had been abducted by unknown assailants the previous night and that those assailants attached the bomb vest to his body and placed other bombs throughout Whispering Oaks Ranch. The threat was clear: between Sprague's bomb vest and other bombs throughout the property, Charlene, Sam, and their wedding guests were in grave danger.

28. Ms. Binks demanded that Sprague leave the ceremony and immediately called 911 to report his bomb threat. Sprague ran away from the ceremony when Ms. Binks began dialing her phone.

29. Ms. Binks then reluctantly informed Charlene—who was moments away from walking down the aisle—that Sprague was in the vicinity wearing a bomb

vest and making threats. Charlene was hit with a flurry of powerful, overwhelming emotions. She feared for her life, Sam's life, and those of her close family and friends attending the ceremony. She immediately tied Sprague's conduct to Jayne's threats to ruin the wedding if she was disinvited, and was mortified that her own mother would follow through on those threats. But far worse, Charlene was humiliated that the most important moment of her life had been ruined. She was crushed.

30. For the sake of her family and friends, Charlene continued with the ceremony even though, by then, word was spreading among the assembled guests that a man wearing a bomb vest was lingering near the ceremony. Pregnant women ran from the ceremony, and parents shielded their children. Although the ceremony was completed, Charlene was filled with simultaneous feelings of terror, outrage, and crushing disappointment.

31. Although many of Charlene's family and guests were unnerved by the reports of Sprague and his bomb vest that were quickly spreading, they reluctantly re-grouped to begin eating, drinking, dancing, and other traditional post-ceremony activities.

32. But Sprague wasn't finished. Although he initially fled the ceremony when Ms. Binks called 911, he later attempted to drive back to the ranch area where the post-ceremony festivities were taking place. Fortunately, a Grand County Sheriff's deputy spotted Sprague and he was apprehended before he could arrive.

33. Those deputies called Ms. Binks and notified her that Sprague had been arrested trying to return to the wedding. Ms. Binks passed this news on to Charlene. Charlene was already terrified that Jeffrey or Daniel were also in the area and would also try to disrupt the wedding. That terror increased exponentially when she was told that Sprague tried to return to the wedding. As a result of these fears, Charlene reluctantly told her wedding guests about Sprague's return and the possibility of other efforts to disrupt the festivities. She told her wedding guests to return to their rooms and wait for further word from law enforcement. The celebration stopped. The wedding was over—and ruined.

**E. The Aftermath**

34. During a search of Sprague's vehicle after he was apprehended, deputies discovered two containers of Tannerite—a powerful explosive when ignited correctly—along with at least one Molotov cocktail, a set of nunchucks, marijuana and cocaine. Sprague's bomb threats were no mere joke; he brought actual explosives to Charlene's wedding.

35. When questioned by police, Sprague admitted that Jeffrey told him to travel to Whispering Oaks Ranch and crash Charlene's wedding.

36. Later forensic analysis of Sprague's cell phone revealed that, between July 14th (shortly after Jayne was disinvited from the wedding) and August 5th, Sprague, Jeffrey, and Daniel had been in constant telephone contact with each other.

Investigators also found numerous text messages between the three men discussing Sprague's trip to Moab, with Daniel and Jeffrey directing Sprague's conduct.

37. Sprague, Daniel, and Jeffrey were all charged criminally for their roles in ruining Charlene's wedding.

38. Charlene was ruined by this experience. She and Sam were too shaken by these events to go on their long-planned honeymoon to Alaska. Far worse, Sam—who had been sober for 7 years before the wedding—immediately relapsed and checked himself into a rehabilitation clinic in Utah.

39. The strain of these events initially proved too much for Charlene and Sam, and they lived separately for the first 18 months of their marriage.

40. Charlene experiences panic attacks, nightmares, and crippling anxiety nearly every day. She must take medication daily to deal with these feelings and emotions. She lives in a constant state of fear that Jeffrey or Daniel will take further actions to ruin her life.

41. Incredibly, Jeffrey continued his campaign of harassment against Charlene even after he was charged criminally for his role in Sprague's bomb threats. When Charlene and Sam appeared at one of Jeffrey's criminal hearings, he harangued and threatened them so much that a bailiff was forced to remove him from the courtroom.

## CAUSES OF ACTION

### COUNT I – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (Against all defendants)

42. Charlene restates and incorporates by reference her allegations in paragraphs 1 through 41 above.

43. Defendants planned and executed a scheme to ruin the most important day of Charlene's life by causing Sprague to travel to Charlene's wedding with explosives and other weapons, wearing materials fashioned to resemble a bomb vest used by terrorists, and making a bomb threat at the exact moment Charlene was about to walk down the aisle—the moment she waited her whole life for.

44. This conduct is extreme, outrageous, and intolerable in a civilized society.

45. Defendants intended to cause severe emotional distress to Charlene.

46. Charlene suffered—and continues to suffer—severe emotional distress (including trauma, fear, and humiliation) because of Defendants' conduct.

47. Accordingly, Charlene is entitled to damages in an amount to be determined at trial, which amount includes attorneys' fees and punitive damages.

### COUNT II – INVASION OF PRIVACY (Against all defendants)

48. Charlene restates and incorporates by reference her allegations in paragraphs 1 through 47 above.

49. Charlene had a reasonable expectation of privacy during her wedding—an intimate and private invitation-only event at a destination location inaccessible to the general public.

50. Defendants, through their scheme, intruded upon Charlene's privacy.

51. This intrusion would be highly offensive to any reasonable person and caused Charlene great mental and emotional harm.

52. Accordingly, Charlene is entitled to damages in an amount to be determined at trial, which amount includes attorneys' fees and punitive damages.

**COUNT III – ASSAULT**
**(Against all defendants)**

53. Charlene restates and incorporates by reference her allegations in paragraphs 1 through 52 above.

54. Under Utah law, assault is defined as an act performed with the intent to cause an imminent apprehension of harmful or offensive conduct.

55. By planning and executing the scheme discussed above—which resulted in Charlene learning of a bomb-threat and the close proximity of a man wearing a bomb moments before she would walk down the aisle—Defendants caused Charlene to experience an imminent apprehension of violent and potentially deadly conduct.

56. Accordingly, Charlene is entitled to damages in an amount to be determined at trial, which amount includes attorneys' fees and punitive damages.

**COUNT IV – CIVIL CONSPIRACY**
**(Against all defendants)**

57. Charlene restates and incorporates by reference her allegations in paragraphs 1 through 56 above.

58. Defendants knowingly and willfully agreed to act together to retaliate against Charlene by disrupting her wedding and causing her to experience great mental and emotional harm.

59. Defendants took overt actions in furtherance of that conspiracy, including instructing and causing Sprague to travel to Charlene's wedding with explosives and other weapons, wearing materials fashioned to resemble a bomb vest used by terrorists, and making a bomb threat at the exact moment Charlene was about to walk down the aisle.

60. As a result of this civil conspiracy, Charlene is entitled to damages in an amount to be determined at trial, which amount includes attorneys' fees and punitive damages.

**COUNT V – INTENTIONAL INTERFERENCE WITH CONTRACT**
**(Against all defendants)**

61. Charlene restates and incorporates by reference her allegations in paragraphs 1 through 60 above.

62. As discussed above, Charlene spent tens of thousands of dollars entering into contracts with Whispering Oaks Ranch, her wedding planner, and other

vendors. The purpose of these contracts was to ensure that Charlene's wedding day was as magical and memorable as she always hoped it would be.

63. Defendants intentionally interfered with the purpose of these contracts through the improper means discussed above.

64. As a result of Defendants' wrongful conduct, Charlene was significantly damaged because she was unable to enjoy the benefits of her wedding-related contracts.

65. Accordingly, Charlene is entitled to damages in an amount to be determined at trial, which amount includes attorneys' fees and punitive damages.

ACCORDINGLY, Charlene respectfully requests the following relief from this Court:

1. Enter judgment against Defendants, jointly and severally, on Counts I through V of this complaint and award Charlene damages in an amount to be determined at trial, which amount includes attorneys' fees and punitive damages;

2. Tax all costs of this suit against Defendants, jointly and severally; and

3. Grant Charlene such other and further relief as this Court deems just and proper.

Dated: August 1, 2025

JEREMY DELICINO
JON D. WILLIAMS
/s/ Jon D. Williams
JEREMY DELICINO
Attorneys for Plaintiff
Charlene Hack

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury.

Dated: August 1, 2025

JEREMY DELICINO
JON D. WILLIAMS

/s/ Jon D. Williams
JEREMY DELICINO
Attorneys for Plaintiff
Charlene Hack